ERNEST G. WESLEY *et al., v.* M. N. CARTIER & SONS COMPANY.

MARCH 2, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Gangways.    Right of Way.    Construction of Deed.*

X., being the owner of a tract of land bounding southerly on Smith street, comprising two lots numbered 69 and 70, together with certain premises adjoining said lots on the north, conveyed the southerly 88 feet of lot 70 to Y. X. and Y. thereafter entered into an agreement reciting that "considering that it will be a benefit to the owners of said two lots of land to lay out a twelve feet gangway between said lots" do for themselves, their several heirs, executors, administrators, and assigns, covenant to establish such gangway "to be kept open for the joint use and benefit of X. and Y., their heirs and assigns, and not to be shut up or have any buildings erected thereon, without the consent of X. and Y., their heirs or assigns."

The gangway was established of a width of 12 feet and extending back from Smith street northerly for 88 feet.

At this time X. owned a barn on the premises adjoining the lots on the north; there was nothing on the lots for which the way could be used, and it was used from its creation to reach this barn, and was the only means of reaching it. There was nothing on the land of Y. for which it could be used.

By mesne conveyances, defendant acquired the interest of X. in the northerly 12 feet of lots 69 and 70, and the premises adjoining on the north (all designated as lot 6), with a right to use the way from the south side thereof

to Smith street. Complainants had acquired the interest of Y. in the southerly 88 feet of lot 70, and of X. in the southerly 88 feet of lot 69, this last conveyance being subject to the right of way granted respondent:—

*Held,* that the agreement was for the benefit of the premises owned by X. and Y., and it was to be determined, from the facts and circumstances of the case, just what those premises were.

*Held,* further, that the right of way was not confined to such portions of lots 69 and 70 as X. then owned, but was appurtenant to the other land owned by X. contiguous to said lots, and was now appurtenant to the whole of lot 6.

(2)   *Construction of Deed.*

In construing a written instrument the court will consider all the facts and circumstances existing at the time of its execution, such as the relations of the parties, the nature and situation of the subject matter, and the apparent purpose of making the instrument.

(3)   *Construction.*

This court , in construing deeds, wills, and instruments, has always considered all the facts and circumstances, the relations of the parties, the location of their estates, and given great weight to the construction placed by the parties themselves by their acts and conduct.

(4)   *Construction.*

Where an instrument creating a right of way does not define at all, or when applied to existing facts and circumstances does not define clearly, the premises to which it shall be appurtenant, the subsequent use of the way by the parties will be almost conclusive as to the extent and exact limits of the dominant estate.

BILL IN EQUITY.   Heard on appeal of complainant, and decree of Superior Court, dismissing bill, affirmed.

PARKHURST, J.   This cause is a suit in equity, brought by Ernest G. Wesley and Patrick J. Fox, to enjoin the use of a way. It was heard in the Superior Court, upon bill, answer, replication, and oral testimony, upon agreed issues of fact, and a final decree was entered dismissing the bill of complaint.   The cause is before the court upon the complainants' appeal from this decree.

The material facts admitted on the pleadings and established by uncontradicted evidence may be summarized as follows: prior to the year 1849, one Henry J. Angell was the owner of a tract of land bounding southerly on Smith street in Providence, comprising two lots extending one hundred feet from Smith street and numbered 69 and 70 on a certain plat

MAP
OF LAND IN PROVIDENCE,
BELONGING TO
CHAS S PETTEE
BY J A LATHAM,
JULY 1903

SCALE 30 FT PER INCH

Plat of land on
Smiths Hill
(160 ft to an inch)
Surveyed April 1st 1830
by Isaac Matheson

This plat received on file April 29th AD 1830 and to be reclaimed in this office as the original plat having been received of Stanford Newell & Peter Pratt
Witness Richard A Field
Town Clerk

dated 1830 and surveyed by Isaac Mathewson. He also owned certain premises adjoining said lots 69 and 70 on the north. The latter premises, together with the northerly twelve feet of said lots 69 and 70, are now designated as lot 6 on a certain plat, dated 1903, called the "Pettee Plat," and are now owned by the defendant. For convenience, a reduction of each plat is submitted herewith. Upon the "Pettee Plat" lot 1 comprises the southerly eighty-eight feet of said lot 69. Prior to said year 1849, the said Henry J. Angell conveyed the southerly eighty-eight feet of lot 70 to one Nathaniel W. Westcott, who is the predecessor in title of the complainant Wesley. On June 16, 1849, the said Westcott and Angell entered into the following agreement establishing a gangway which is the subject of this controversy: "This agreement made and entered into this 16th day of June, A. D. one thousand eight hundred and forty-nine, by and between Henry J. Angell and Nathaniel W. Westcott, both of the city and county of Providence in the State of Rhode Island, witnesseth,

"That whereas the said Henry J. Angell and Nathaniel W. Westcott are owners of two certain lots of land situate on the northerly side of Smith street in said city of Providence, being lots numbers sixty-nine and seventy on plat of land on Smiths Hill, surveyed April 11, 1830, by Isaac Mathewson. And the aforenamed parties, considering that it will be a benefit to the owners of said two lots of land to lay out a twelve feet gangway between said lots of land, do for themselves, their several heirs, executors, administrators and assigns, covenant and agree each with the other that for the purpose of making a gangway as aforesaid, he the said Henry J. Angell, shall throw off from the said lot of land owned by him six feet, to be measured off from the west end of his said lot of land, commencing on said Smith street and extending back northerly eighty-eight feet, and that the said Nathaniel W. Westcott shall throw off from the said lot of land owned by him six feet, to be measured off from the east end of his said lot, commencing on said Smith street and extending back northerly eighty-eight feet.

"Said gangway to be kept open for the joint use and benefit of the said Henry J. Angell and Nathaniel W. Westcott, their

heirs and assigns, and not to be shut up or have any buildings erected thereon without the consent of the said Henry J. Angell and Nathaniel W. Westcott, their heirs or assigns.

"In witness whereof we have hereunto set our hands and seals this 10th day of June, A. D. 1849.

"(Signed)

"HENRY J. ANGELL,            (Seal)
"NATHANIEL W. WESTCOTT."  (Seal)

At the time of this agreement Henry J. Angell owned the whole of lot 69, the northerly twelve feet of lot 70, and the aforesaid premises adjoining on the north.   Angell died in 1873, and said property thereupon descended to his widow, Eliza Angell. Eliza Angell died in 1894 seized of said property, and the same was thereafter purchased by one Charles S. Pettee, by whom the above-mentioned "Pettee Plat" was made.   Charles S. Pettee, on August 18, 1903, conveyed said lot 6 to one Ozilda Cartier, the defendant's grantor, and purported to grant to her a right to use the way from the south side thereof to Smith street. On the same day he conveyed to the complainant Fox the said lot 1, being the southerly eighty-eight feet of lot 69, and being the premises now occupied by said Fox.   This conveyance to Fox was made subject to the right of way granted to Ozilda Cartier.  The defendant, in 1906, purchased lot 6 from Ozilda Cartier and now owns the same.   The gangway thus established by agreement on June 16, 1849, has been kept open ever since.   It leads to lot 6, and has been used since 1849 by the owners and occupants of said lot, including the defendant, to go to and from the lot with horses and wagons.   The history of its use is as follows:

Henry J. Angell owned a barn on lot 6 at the time the agreement was made, which is indicated on said plat by the shaded portion of lot 6.   This barn was situated on a portion of lot 6 lying to the north of said lot 70.   Mr. Angell, until his death, in 1873, used this way to pass to and from this barn with horses and wagons.   After his death the way was used continuously for the same purpose by tenants of Mrs. Angell until her death, and thereafter by tenants of Charles S. Pettee, until the year

1903, when the property was purchased by Ozilda Cartier. After the purchase by Mrs. Cartier, the use was continued until the property was acquired by the defendant, in 1906. The defendant, in 1906, removed the above-mentioned barn from lot 6, constructed a new barn thereon, and continued the use of the way to said barn until the time of this action. The new barn was built upon the northerly twelve feet of the aforesaid lots 69 and 70, and also upon a portion of lot 6 lying to the north of said lots. The main door of this barn is at the end of the gangway and upon the division line between lot 6 and the gangway. The gangway is the sole means of going to and from the barn.

After a hearing upon the agreed issues, the Superior Court decided (1) that the agreement of 1849 gives to the defendant the right to use the way as appurtenant to so much of his barn as is situated on the northerly twelve feet of lots 69 and 70; (2) that the defendant has a right by prescription to use the way as appurtenant to the remainder of his barn, as against the complainant Wesley, and (3) that the complainant Fox is estopped to deny the defendant's right by accepting a deed reserving the right of way to the defendant's grantor.

The complainants appealed from the final decree, based upon this decision, on the general grounds that the decision was against the evidence and the weight thereof and against the law, and that the justice erred in his conclusions of fact and in his conclusions of law.

(1) The agreement of 1849 between Angell and Westcott recites that the parties, "considering that it will be a benefit to the owners of said two lots of land (69 and 70) to lay out a twelve-foot gangway between said lots of land," do, for themselves, their several heirs, executors, administrators, and assigns, covenant and agree to establish the gangway in the manner therein specified. The agreement contains the following clause: "Said gangway to be kept open for the joint use and benefit of the said Henry J. Angell and Nathaniel W. Westcott, their heirs and assigns, and not to be shut up or have any buildings erected thereon without the consent of the said Henry J. Angell and Nathaniel W. Westcott, their heirs or assigns."

The question is, to what land is the way made appurtenant by the agreement? Does the recital that the parties lay out the way, considering that it will be a benefit to the owners of lots 69 and 70, confine the use of the way to those two lots, or, does the provision that the gangway be kept open for the use and benefit of the parties give to one of them a right to use the way for the benefit of other land, then owned by him, contiguous to said lots?

At the time of the agreement, Angell owned lot 69, the northerly twelve feet of lot 70, and the premises adjoining lots 69 and 70 on the north,—the latter premises, together with the northerly twelve feet of lots 69 and 70, being now designated as lot 6 on the "Pettee Plat" and being the premises now owned by the defendant.

This court is clearly of opinion that the right of way under the agreement is not confined to the southerly twelve feet of lot 6, but is appurtenant to the whole of lot 6. The determination of this question depends upon the proper interpretation of the agreement. The fact that the parties are referred to as the owners of lots 69 and 70 is by no means conclusive that these lots are the only ones to be benefited. It was necessary to state the ownership of these lots in order to show the right of the parties to establish the way, which was composed entirely of land taken from these lots; and it is significant that the agreement nowhere states in terms that the way is established for the benefit of the *lots*. It is rather for the benefit of the *owners*, their heirs and assigns. It is the premises owned by Angell and Westcott that are to be benefited, and it is to be determined, from the facts and circumstances of the case, just what these premises were.

(2)    It is a well-settled rule that in construing a written instrument the court will consider all the facts and circumstances existing at the time of its execution; such as the relations of the parties, the nature and situation of the subject-matter, *and the apparent purpose of making the instrument.*

To quote the language of a late textwriter on the law of evidence: "The truth had finally to be recognized that words always need interpretation; that the process of interpretation

inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. 'Words *must* be translated into things and facts.' Instead of the fallacious notion that 'there should be interpretation only when it is needed,' the fact is that there must always be interpretation. . . . The deed must be applied 'physically to the ground.' . . . Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore all the circumstances must be considered which go to make clear the sense of the words,—that is, their association with things." 4 Wigmore on Evidence § 2470 (3).

(3)    This court, in construing deeds, wills, and other instruments whereby the rights of parties are to be determined, has always considered all the facts and circumstances, the relations of the parties, the locations of their several estates, and has always given great weight to the construction placed by the parties themselves, by their acts and conduct, upon the particular instrument under which claim is made. Thus in *Garraty* v. *Duffy*, 7 R. I. 476, p. 477, Ames, C. J., says: "There is no foundation for the defendant's claim, that because the reservation in Grinnell's deed to Ahern, and in Ahern's to the plaintiff, is in general terms, he can change his mode of access to the well at his convenience, after the mode reserved had been *fixed by the assent of the original parties*, as we must presume that it was, by several years exclusive use of a particular way."

Again this court, in *Smith* v. *Greene*, 19 R. I. 558, in construing a trust will, said, in conclusion, p. 561: "The construction which we have given to the clause was that adopted by the trustee in conveying the trust estate to the parties in interest and is the one which has been acquiesced in by such parties since 1882. Even if we did not altogether approve of it, as in our opinion conformable to the testator's intention, we should hesitate to change it after the acquiescence in it of the parties interested for so long a period."

Again, in *Gallagher* v. *R. I. Hospital Trust Co.*, 22 R. I. 141, in construing the provisions of a will and codicil, relating to the disposition of personal property, the court says, p. 150: "The case shows that the constructions which we have given to the paragraph in question are those which have been given to them by the parties in interest. . . . Though such action on the part of Charles and Charlotte is not conclusive of the question, it is nevertheless strong evidence of the construction of the will and codicil by persons nearest to the testatrix, and who, it is not improbable, may have known her actual intentions."

In *Bullock* v. *Phelps*, 27 R. I. 164, the facts were very similar to those in the case under consideration. A deed of "lot B" to one Crandall granted also to said Crandall a right of way over the grantor's land to a highway "from the said Crandall's land." Crandall owned "lot A," adjacent to and beyond "lot B." The question arose whether the grant gave a right of way merely to "lot B," or to "lot B" and "lot A," the defendant contending that, if the former were true, there was a right to "lot A" by prescription. The court made a careful examination of the testimony, and determined that the language of the deed should be broadly construed, and that it was the intention of the grantor, to be gathered from the circumstances existing when the deed was made, to give to Crandall a use to both lots. The court says: "It would have been easy for the grantor to restrict the operation of the grant by simple words to the *premises* described in the deed. He did not see fit to do so, and there is no evidence of any intent to do so in any part of the deed or in the evidence in the case." And the same rules of construction have been applied in other jurisdictions. In *Durkee* v. *Jones*, 27 Colo. 159, 164, it was held that where an instrument creating a right of way does not clearly indicate that the easement is appurtenant to any particular estate, yet it must be deemed to be an appurtenance, originally, to certain tracts, "because from their situation with respect to this portion of the alley, its availability for use in connection therewith, and the fact that it adjoined an alley in which these parties also had a right, are circumstances from which it is clearly inferable that

it was intended by the parties entering into the original agreement respecting it, that it should be appurtenant to these lands." So, in the case of *Dennis* v. *Wilson*, 107 Mass. 591, the court, on p. 592, says: "In this case, Jenkins conveyed to Rice part of his entire tract of land. The right of way, excepted and reserved, extended from the highway in front, along the line of division, for a specified distance, less than the whole depth of the lots. As the grantor could have no occasion, apparently, to use such a way for any other purpose than for access to and egress from his remaining land, the inference would seem to be inevitable that it was for that use that both parties must have understood and intended the way to be held." In *Bannon* v. *Angier*, 2 Allen, 128, the court says, p. 129: "Where a right of way, or other easement, is granted by deed without fixed and defined limits, the practical location and use of such way or easement by the grantee under his deed, acquiesced in by the grantor at the time of the grant and for a long time subsequent thereto, operate as an assignment of the right, and are deemed to be that which was intended to be conveyed by the deed, and are the same, in legal effect, as if it had been fully described by the terms of the grant." See also *Dakin* v. *Savage*, 172 Mass. 23; *Stetson* v. *Curtis*, 119 Mass. 266; *Stone* v. *Clark*, 1 Met. 378.

(4)    It follows, from the principles above stated, that, where the instrument creating a right of way does not define at all, or when applied to existing facts and circumstances does not define clearly, the premises to which the way shall be appurtenant, the subsequent use of the way by the parties will be well-nigh conclusive as to the extent and exact limits of the dominant estate.

An examination of the testimony in the case under consideration shows that it was the intention of the parties to the agreement, not to confine the use of the way by Angell to lot 69 and the northerly twelve feet of lot 70, but to give to him the right to use the way as appurtenant to the premises adjoining on the north. Such intention is to be gathered from the following state of facts:

. At the time of making the agreement, or immediately thereafter, Angell owned a dwelling-house on lot 69 and owned a barn

on lot 6, which is indicated on the "Pettee Plat" by the shaded portion of said lot. This barn did not occupy any portion of lot 69 and 70, and at the time of the agreement there was no barn or building on lot 69 or 70 for which the way could be used. The way was used from its creation to reach said barn: it was the only means of reaching said barn and was used almost solely for that purpose. No use was made of it at that time by Westcott, so far as appears. Many years later he built a barn on lot 70, but at the time of the agreement there was no building on his land, for the benefit of which the way could be used. Furthermore, as has been said, the use to the barn is the sole use to which Angell put the way, and this use was continuous and uninterrupted from the creation of the way.

All of these facts point to the conclusion that the parties, in drawing this agreement, intended to create a right of way appurtenant to the premises upon which this barn was situated. Such appears to be the practical construction of the instrument, as gathered from the acts of Angell and the acquiescence of Westcott and Wesley; and such is the construction placed upon it by the subsequent continuous use of the way.

We are clearly of the opinion that the agreement of June 16, 1849, should be construed, in the light of all the facts in this case and of the continuous construction placed thereon by all parties in interest for nearly sixty years, to have created a right of way, for the benefit of Henry J. Angell and his heirs and assigns, appurtenant not only to his lot 69 on the original Isaac Mathewson Plat, but also to his land in the rear and northerly thereof, later designated as lot 6 on the "Pettee Plat;" and that the respondent has full right to the use of said way, as claimed by it, as appurtenant to its lot with the stable thereon.

The decree of the Superior Court dismissing the bill of complaint with costs for the respondent is therefore affirmed, the complainants' appeal is dismissed, and the cause is remanded to the Superior Court for further proceedings under said decree.

*James A. Williams,* for complainants.

*G. Edward Buxton, Jr., Edwards & Angell,* for respondent.

*Eugene A. Kingman,* of counsel.